**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**DAVIDE G. COGGINS,**

                              **Plaintiff,**

             **-v-**                                    **13-CV-654S(Sr)**

**JOSEPH A. GERACE, et al.,**

                              **Defendants.**

---

## REPORT, RECOMMENDATION, AND ORDER

Plaintiff, a former pre-trial detainee at the Chautauqua County Jail ("CCJ"), commenced this *pro se* action pursuant to 42 U.S.C. § 1983 alleging that he was denied adequate medical care and double portion meals, deprived of adequate materials to commence an Article 78 proceeding, placed in administrative segregation and in the Special Housing Unit without due process, and retaliated against by CCJ personnel. Dkt. #1.  By Order entered on August 21, 2013, the Hon. Frank P. Geraci, Jr. terminated defendants Chautauqua County Jail Medical Department and Chautauqua County Mental Health Unit as parties to the action, and dismissed plaintiff's access to the courts claim with prejudice.  Dkt. #9.  Judge Geraci's order left intact claims against the following parties:  Joseph A. Gerace, Chautauqua County Sheriff; James Cromwell, Warden of CCJ; Rick Eggleston, Foodservice Supervisor at CCJ; Dennis Mitchell, Lieutenant/Chief Administrative Officer at CCJ; J. Grupa, Correction Sergeant at CCJ, K. Wielgasz, Correction Sergeant at CCJ, S. Garlic, Correction Officer at CCJ; and M.

Seeley, Sheriff's Officer (collectively "County Defendants"); as well as Roderick T. Hunt,

physician's assistant, and Tammy Thayer, nurse practitioner at the CCJ (collectively

"Medical Defendants").

 

The case was thereafter referred to the undersigned by the Hon. William

M. Skretny, in accordance with 28 U.S.C. § 636(b), for all pretrial matters and to hear

and report on dispositive motions.  Dkt. #27.  Various discovery motions were filed

which effectively stayed the dispositive motion deadline contained in the Case

Management Order dated November 20, 2015.  Dkt. #89.  On March 11, 2016,

defendant Hunt filed a motion for summary judgment (Dkt. #105), followed by defendant

Thayer (Dkt. #111) and the County defendants (Dkt. #115).  For the following reasons, it

is recommended that each of the defendants' motions for summary judgment be

granted.

## FACTUAL BACKGROUND

The following facts are taken from the Complaint (Dkt. #1); defendant

Hunt's Statement of Undisputed Facts (Dkt. #106-11); the Expert Affidavit of Louis

Antignano, M.D., in support of defendant Hunt's Motion for Summary Judgment

(Dkt. #106-7), the Affidavit of defendant Hunt in support of his Motion for Summary

Judgment (Dkt. #106-6); the Expert Affidavit of Edward A. Stehlik, M.D., in support of

defendant Thayer's motion for summary judgment (Dkt. #111-5); the Affidavit of

defendant Thayer in support of her motion for summary judgment (Dkt. #111-6), and the

County Defendants' Statement of Undisputed Facts (Dkt. #115-4).

Plaintiff was arrested on charges of murder, burglary, arson, and conspiracy on April 17, 2013 and thereafter admitted to CCJ.  Dkt. #115-4, ¶ 12.  Years prior to his detention at CCJ, plaintiff was diagnosed with Crohn's disease, an inflammatory bowel disease that can affect any part of the intestinal tract.  Dkt. #106-11, ¶ C.  The symptoms of Crohn's disease vary widely from patient to patient with some requiring no treatment and others requiring dietary, medicinal, or surgical intervention.  Dkt. #106-11, ¶ C.  A typically asymptomatic Crohn's patient may suffer acute "flares" of the disease.  Dkt. #106-6, ¶ 13.  As part of his prior treatment for Crohn's, a large portion of plaintiff's colon had been surgically removed.  Dkt. #106-11, p. 1, ¶ D.

Upon admission to CCJ, plaintiff was screened by unnamed members of the CCJ nursing staff.  Dkt. # 106-11, ¶ D.  At that time, plaintiff reported that most recently, his condition had been treated with Humira, an injectable protein, and Dilaudid, an opioid.  Dkt. #106-11, ¶ D.  Plaintiff was immediately placed on a "detoxification protocol" by the CCJ psychiatrist, Dr. Tronetti-McMahon.  Dkt. #106-11, ¶ D.  Plaintiff's weight on admission was noted to be 166 lbs.  Dkt. #106-11, ¶ D.

Approximately three days later, on April 20, 2015, plaintiff was seen by defendant Hunt, a physician's assistant ("PA") under contract with the CCJ.  Dkt. #106-6, ¶ 3.  As a PA, Hunt was qualified to "examine patients, order diagnostic testing and blood work, order consults with specialists if medically indicated, write prescriptions for medications, and make diagnoses as may be appropriate."  Dkt. #106-6, ¶ 3.  According to the medical records, plaintiff was not displaying any symptoms of Crohn's disease.

Dkt. #111-6, ¶ 8.  However, given plaintiff's reported history of the disease, PA Hunt

prescribed diclofenac, an analgesic, for pain control; Imodium for diarrhea; Prilosec to

control acid production; and Prednisone, a steroid, for potential inflammation.  Dkt.

#106-11, ¶ D.  He also ordered that plaintiff be given an evening snack.  Dkt. #106-11,

¶ D.  PA Hunt asked plaintiff to execute HIPAA authorizations for his medical records to

confirm his diagnosis of Crohn's disease and his past use of Humira.  Dkt.#106-11, ¶ D.


According to PA Hunt, opioid pain medications (such as Dilaudid) are not

typically used at CCJ, except for inmates with severe pain issues, "given the high

propensity for diversion or misuse."  Dkt. #106-6, ¶ 11.  Instead, medical staff at the

CCJ uses "a variety of other medications to achieve proper pain control for inmates."

Dkt. #106-6, ¶ 11.  Humira, an injectable protein that can reduce inflammation caused

by certain types of autoimmune diseases, including Crohn's, is a powerful medication

with serious potential side effects, some life threatening.  Dkt. #106-6, ¶¶14, 16.  For

this reason, PA Hunt wanted to verify plaintiff's prior Humira treatment through his

records before prescribing the medication.  Dkt. #106-6, ¶ 16.  According to PA Hunt,

the medications that he did prescribe were "entirely appropriate for the management of

Crohn's at that time."  Dkt. #106-6, ¶ 16.


According to PA Hunt, the typical medical protocols at CCJ are as follows:

after an initial evaluation, an inmate who wishes to see someone in medical must fill out

a "Chautauqua County Inmate Health Services Request" form.  Dkt. #106-6, ¶ 17.  The

forms are "triaged" by the nurses, but if the nurses cannot handle the request, the

inmate is scheduled for "sick call" with PA Hunt or defendant Thayer, a nurse practitioner ("NP") under contract with the CCJ.  Dkt. #106-6, ¶ 17.  Occasionally, PA Hunt or NP Thayer were asked to review or comment on a "Health Services Request" form if, for example, "an inmate files a grievance regarding his medical care."  Dkt. #106-6, ¶ 18.  PA Hunt's practice was to sign or make a note on any "Health Services Request" form he personally reviewed.  Dkt. #106-6, ¶ 18.

On April 25, 2013, plaintiff filed a "Health Services Request" indicating that he was not "eating enough" and second request on April 26, 2013 relating to his diet. Dkt. #111-6, ¶ 10.  NP Thayer reviewed the original request on April 27, 2013, and documented that plaintiff had just been seen in sick call and was not taking his Imodium as prescribed.  Dkt. #111-6, ¶ 10.  On April 30, 2013, plaintiff filed a grievance (No. 2013-116) demanding "Humira shots, the correct diet and all other medications a free person in [his] condition" would be prescribed.  Dkt. #106-11, ¶ F.  At that time, the CCJ had not received plaintiff's medical records substantiating his Crohn's diagnosis and prior use of Humira.  Dkt. #106-11, ¶ F.  To address plaintiff's complaint, PA Hunt issued a phone order increasing plaintiff's Prednisone dosage.  Dkt. #106-11, ¶ F. Plaintiff's grievance was denied at the facility level, and his appeal was denied by the Citizen's Policy and Complaint Review Commission ("CPCRC") on July 11, 2013.  Dkt. #106-11, ¶ G.

On May 2, 2013, Dr. McMahon-Tronetti, the CCJ psychiatrist, saw plaintiff and adjusted plaintiff's mental health medication, but made no mention of Crohn's-

related symptoms in her report.  Dkt. #106-11, ¶ H.  On May 4, 2013, NP Thayer examined plaintiff in sick call.  Dkt. #106-11, ¶ I.  She noted that plaintiff's medical records had been requested but had not yet come in.  Dkt. #106-11, ¶ I.  Plaintiff advised NP Thayer that he had recently been detained at Comstock Correctional Facility and was treated at Binghamton Hospital for flare ups of his Crohn's disease, but he could not recall the name of his treating physician and would not provide his social security number to obtain these additional medical records.  Dkt. #111-6, ¶ 12.

Plaintiff's physical exam revealed that he had positive bowel sounds and was "non-tender to palpation."  Dkt. #106-11, ¶ I.  Plaintiff requested that NP Thayer discontinue his prescribed pain killer, diculofenac, and order double portion meals.  Dkt. #106-11, ¶ I.  NP Thayer was familiar with Crohn's disease and it was her understanding that "small portion meals were appropriate."  Dkt. #111-6, ¶12.  "[I]n an abundance of caution," NP Thayer reviewed the treatment guidelines for Crohn's disease on the Mayo Clinic website, which recommended "small meals, daily exercise, limitations on fiber, relaxation, and breathing exercises."  Dkt. #111-6, ¶ 12.  Accordingly, NP Thayer discontinued the diclofenac, and prescribed Asacol, "a common medication for the treatment of Crohn's disease," but declined his request for double portion meals.  Dkt. #111-6, ¶ 12.  She also advised plaintiff that his request for Humira could not be fulfilled until the CCJ received his medical records.  Dkt. #111-6, ¶ 12.

On May 7, 2013, plaintiff's medical records confirming his prior treatment with Humira arrived at the facility, and PA Hunt ordered the medication.  Dkt. #106-6,

¶ 25.  Plaintiff was administered his first Humira injection at CCJ on May 14, 2013, and every two weeks thereafter (consistent with a standard Humira dosing schedule) except when he refused to attend sick call.  Dkt. # 106-6, ¶ 25.

On May 8, 2013, plaintiff filed a "Health Services Request" claiming increased pain because he was not getting double portion meals.  Dkt. #106-6, ¶ 26.  PA Hunt and other CCJ personnel had observed plaintiff engaging in strenuous exercise in the cell block gallery and the recreation yard, suggesting that he was not in terrible pain as he claimed.  Dkt. #106-6, ¶ 27.  PA Hunt and Cindy Weise, a Registered Nurse at CCJ, noted the inconsistency on plaintiff's "Health Services Request" form.  Dkt. #106-6, ¶ 27.  Plaintiff alleges that he was "ordered" by NP Thayer to exercise "as a remedy to his medical concerns."  Dkt. #118, ¶ 20.  Plaintiff filed additional sick call requests on May 12, and May 13, 2013.  Dkt. #106-6, ¶ 27.

PA Hunt saw plaintiff at sick call on May 14, 2013, at which time plaintiff reported weight loss and complained that he was only getting between 1500 and 1800 calories per day.  Dkt. #106-6, ¶ 28.  Plaintiff's weight was noted to be 161 lbs, approximately five pounds less than his weight on intake.  Dkt. #106-6, ¶ 28.  PA Hunt requested that plaintiff's weight be taken weekly "so any weight loss could be objectively verified."  Dkt. #106-6, ¶ 28.  PA Hunt also requested a calorie count from CCJ Food Service Supervisor Rick Eggleston, who reported that plaintiff was receiving 3,000 calories per day with his extra evening snack.[1]  Dkt. #106-6, ¶ 28.  For this reason, PA

---

[1] Plaintiff alleges that "the calorie count given by the dietitian was a blatant lie" in the proposed amended complaint attached as an exhibit to his response to the County defendants' motion for

Hunt did not believe it was medically necessary to order any changes to plaintiff's diet. Dkt. #106-6, ¶ 28.

At all times relevant to this action, the New York State Department of Corrections Food Production Center created the menus for the CCJ. Dkt. #115-4, ¶ 25. Prior to being sent to CCJ, the proposed menus were approved by a registered dietitian, who recommended portion sizes for each item on the menu to ensure that the meals had sufficient calories and nutrients. Dkt. #115-4, ¶ 26. Kitchen staff at the jail measured ingredients in accordance with the dietitian's recommendations so that portion sizes were consistent. Dkt. #115-4, ¶ 27. In this respect, CCJ's Foodservice Supervisor did not exercise control over the amount of calories in a standard inmate meal. Dkt. #115-4, ¶ 28.

Absent special circumstances, all CCJ inmates were generally served the same meals and portion sizes. Dkt. #115-4, p. 29. If an inmate required a special diet due to a medical condition, someone from the medical staff would have to approve and order a special diet. Dkt. #115-4, ¶ 30. Without medical authorization, no one on the kitchen staff can serve meals that deviate from the standard menu. Dkt. #115-4, ¶ 31.

---

summary judgment. Dkt. #118. It bears noting that this Court denied plaintiff's motion to amend the complaint on February 3, 2017, as it was made more than a year after the last of several deadlines to amend and after summary judgment motions were filed in this case. Dkt. #122. To be clear, the Complaint at Docket No. 1 remains the operative pleading. The Court will consider the proposed amended complaint to the extent that plaintiff has relied upon it in his opposition to the County Defendants' motion for summary judgment. Dkt. #118. In this regard, this Court has given plaintiff extra latitude in adjudicating his claims. Plaintiff did not file a statement of undisputed facts or otherwise respond to those filed by the various defendants. More importantly, plaintiff has no evidence in admissible form which refutes that proffered by the defendants.

Likewise, corrections officers cannot provide non-standard meals to an inmate without medical authorization.  Dkt. #115-4, ¶ 33.

On May 17, 2013, plaintiff filed a request to be seen in medical claiming that he was having a "flare" or was on the "verge" of a major flare of his Crohn's disease.  Dkt. #106-6, ¶ 29.  PA Hunt saw plaintiff in medical, likely on May 18, 2013.[2] Dkt. #106-6, ¶ 29.  According to PA Hunt, when plaintiff was told that his shackles could not be removed, he became belligerent and refused to be weighed.  Dkt. #106-6, ¶ 29; Dkt. #105-15, pp. 24-25.  PA Hunt advised plaintiff that the shackles would be weighed separately and subtracted from his overall weight, and that CCJ could not document his claimed weight loss without objective weight measurements.  Dkt. #106-6, ¶ 29. According to PA Hunt, plaintiff opted to return to his cell.  Dkt. #106-6, ¶ 29.  Plaintiff claims PA Hunt refused to treat him, but in any case, it is undisputed the plaintiff was not weighed at that time.  Dkt. #106-6, ¶ 29.

When an inmate makes a verbal complaint regarding a medical issue, it is the policy of the CCJ correction officers to instruct the inmate to fill out a "Health Services Request" form or, if the issue appears to be serious, to contact the medical staff.  Dkt. #115-4, ¶ 38.  The record reflects that plaintiff filed "Health Services Request" forms on May 21, 25, and 26, 2013, the last of which indicating that he was vomiting and in pain.  Dkt. #105-5, pp. 24-28.  The requests were submitted to medical staff for

---

[2] The medical record reflects that plaintiff was seen on May 14, 2013, but PA Hunt states that this date is incorrect as it precedes the date of plaintiff's sick call request.  Dkt. #106-6, ¶ 29. May 18, 2013, a Saturday, was the first date that PA Hunt would have worked at CCJ, consistent with his regular Tuesday/Saturday schedule.  Dkt. #106-6, ¶¶ 5, 29.

review.  Dkt. #105-15, pp. 24, 26, 28.  On May 26, 2016, PA Hunt issued a phone order for Zofran, an anti-nausea medication, to address plaintiff's complaints, and scheduled him for the next sick call on May 28, 2013.  Dkt. #106-6, ¶ 30.

Plaintiff alleges that after his aborted May 17, 2013 sick call, he experienced an "extreme exacerbation of his Crohn's disease," that he "begged" defendants Grupa, Wielgasz, and Garlic, the correction officers on his unit, to "contact the medical department on his behalf," but they "ignored" his requests.[3]  Dkt. #118, ¶ 67.  Because of the "complete indifference of facility personnel," plaintiff claims he was "forced to rely on his own historical knowledge of how best to treat his condition without the benefit of external medical assistance," which was "to give his digestive tract full rest; meaning he would have to go without eating or drinking for as long as it took to recover from the unbearable pain he was enduring."  Dkt. #118, ¶ 68.  Records reflect that plaintiff refused all of his medications as well as lunch on May 26, 2013.  Dkt. #105-18, p. 46.

Plaintiff further alleges that on May 27, 2013, he was so dizzy from vomiting that he lost consciousness and fell down several times.  Dkt. #118, ¶¶ 71-75.  Other than being "issued dissolving nausea tablets" by a nurse, plaintiff claims he

---

[3] Plaintiff also alleges that on May 20, 2013, defendant Crowell placed him on Administrative Segregation status (confining him to his cell, suspending his weekend visits, and requiring that he be handcuffed and shackled when out of the cell block) in retaliation for complaining about his diet and medical treatment.  Dkt. #1, ¶ 55 & Exh. G.  Plaintiff has cited no evidence in support thereof.  According to an incident report dated May 20, 2013, plaintiff was cited for disrespecting staff and unnecessary noise when in response to being told to remove items from his cell bars, plaintiff stated to the officers "you need to stop being so concerned about items on the bars and start doing your job and worrying more about my medical issues," and warned them, "you guys are going to see a different side to me now."  Dkt. #105-18, p. 6.

received no medical treatment and "nothing else was done for [him]."   Dkt. #118, ¶ 73.
Plaintiff contends that because he was too dizzy to stand, Officer Grupa and others
dressed, handcuffed, and shackled him, and "half escorted, half dragged" him to a
"rubber room" "meant to hold the temporarily deranged," and removed his cuffs.  Dkt.
#118, ¶¶ 77-81.  According to plaintiff, the "rubber room" was dirty, had no toilet, sink,
bed, mattress or bedding, and only a ceiling light and a rectangular hole in the floor.
Dkt. #118, ¶¶ 79-80.

Plaintiff claims that for five hours, he remained in the rubber room while
"suffering from extreme pain, nausea, fever/chills and twice fouled himself due to not
having access to a bathroom."  Dkt. #118, ¶ 81.  He was thereafter taken back to his
cell in a wheelchair while in mechanical restraints.  Dkt. #118, ¶ 82.  According to
plaintiff, his placement in the rubber room "was the sole decision of Defendant Grupa
and was done for no other purpose than to punish the Plaintiff for making the Defendant
'work' and to retaliate against the Plaintiff for his complaints and grievances."  Dkt.
#118, ¶ 83.

According to the County defendants, a nurse treated plaintiff with anti-
nausea medication on May 27, 2013 in his cell, but to no effect.  Dkt. #115-4, ¶ 44.  The
record shows that plaintiff fell in his cell at least twice that day and that he was moved to
a padded cell on defendant Grupa's orders "for closer observation" (Dkt. #105-18, p. 9),
where he "would be less prone to injury if he continued to lose consciousness."

Dkt. #115-4, ¶ 46. "Plaintiff was returned to his cell a few hours later when he was no longer a risk to himself." Dkt. #115-4, ¶ 48.

On May 28, 2013, PA Hunt examined plaintiff in his cell. Dkt. #106-6, ¶ 31. Plaintiff reported that he had not been eating or drinking, and PA Hunt noted that he had an increased heart rate and was exhibiting orthostasis (a drop in blood pressure when standing up from a lying or sitting position). Dkt. #106-6, p. 31. Based on plaintiff's symptoms, PA Hunt opined that plaintiff was suffering from dehydration and ordered that he be evaluated at Women's Christian Association Hospital ("WCA") Emergency Room ("ER"). Dkt. #106-6, ¶ 31. Plaintiff was given IV fluids and released that same day from WCA. Dkt. #106-6, ¶ 33; Dkt. #105-15, p. 74.

According to the WCA records, plaintiff was evaluated in the ER by Drs. Conner and Menon, who ordered various tests to determine the cause of plaintiff's symptoms. Dkt. # 105-15, pp. 66-73, 78-94; Dkt. #105-16, pp. 1-5. A summary of plaintiff's treatment prepared by Dr. Menon states, in relevant part:

> The patient reported decreased p.o.[4] intake for the last 1-2 days and increasing lightheadedness when standing up. As per EMS, orthostatic vitals were checked and were found to be positive. I was not able to obtain documentation to confirm this however.
>
> On arrival in the ED, the patient once again received orthostatics vital checks which were found to be within normal limits. The patient also was requesting p.o. food.
>
> Initial workup for the patient in the ED included orthostatics at bed side that were found to be within normal limits. A BMP that was again within normal limits except for a slightly elevated total bilirubin indicating dehydration. A UA reveals 2+ ketones, again indicating dehydration and

---

[4] In medical parlance, "p.o." means "by mouth."

> decreased p.o. intake but no other findings.  A CT of the abdomen, as mentioned, revealed no acute process in the abdomen or pelvis, but a history of sigmoid surgery.
>
> …
>
> The patient does not meet criteria for admission.  **There is no evidence of a Crohn's flare on CT or on his labs.**  He is not orthostatic in the ED and I cannot find documentation confirming this at any point.  I will hydrate him with 2 L of IV fluids here in the ED.  Provide him with p.r.n. Zofran, start him on Budesonide for empiric treatment of a possibly mild Crohn's flare, but I doubt this.  The patient is requesting Budesonide stating that he has had a response to this medication in the past.

Dkt. #105-15, pp. 81, 83 (emphasis added).  Dr. Menon prescribed Imodium, Prilosec, Humira, Gabapentin, Zofran, Budesonide, Tramadol (a pain reliever), and Augmentin upon plaintiff's discharge and ordered double portion meals and Ensure supplements. Dkt. #105-15, p. 83.

Plaintiff claims that when he was first evaluated at WCA, Dr. Connor determined that he "needed to be admitted for at least three days to the Hospital to be treated for Crohn's disease," and ordered narcotic pain relievers, but that defendant Seeley, one of the guards assigned to plaintiff's room "in complete violation of [his] HIPPA rights," "instructed [Dr. Connor] not to keep the Plaintiff on narcotics" and "convinc[ed Dr. Connor] not to have the Plaintiff admitted to the Hospital."  Dkt. #118, ¶ 89; Dkt. #1, p. 73, Exh. M-4(g).  According to plaintiff, Seeley's act of "accosting the Plaintiff's doctor" was done without plaintiff's consent and "for no legally legitimate reason than to interfere with the Plaintiff's . . . proper medical treatment."  Dkt. #118, ¶ 90.  To this Court's knowledge, plaintiff never filed a grievance against the officers asserting that they delayed or denied his medical treatment.

Plaintiff alleges that he was placed in the Special Housing Unit ("SHU") when he returned from WCA on May 28, 2013. Dkt. #1, ¶ 83. It is unclear how long plaintiff's stay in the SHU was, but he wrote a letter to defendant Gerace from "SHU 5 Cell" on June 4, 2013. Dkt #1, p. 54. An incident report dated June 27, 2013, states that plaintiff was in the recreation yard – and not locked on the SHU – when he got into a physical altercation with another inmate on that date. Dkt. #105-18, p. 12.

On May 29, 2013, the day after plaintiff's ER visit, PA Hunt began all of the new medications, Augmentin and Budesonide, prescribed by Dr. Menon at WCA, substituting Tramadol, which CCJ did not stock, with Tylenol. Dkt. #106-6, ¶ 35; Dkt. #106-11, ¶ P. On June 1, 2013, plaintiff was seen in sick call by NP Thayer. Dkt. #106-11, ¶ Q. At that time, plaintiff reported no nausea or vomiting, and his weight was noted to be 161 pounds in shackles. Dkt. #106-11, ¶ Q. NP Thayer requested the records from plaintiff's ER visit, and advised plaintiff that his double portion meals and Ensure supplements would be discontinued since they were not medically indicated for his condition. Dkt. #106-11, ¶ Q. Plaintiff filed a grievance (No. 2013-156) that same day objecting to NP Thayer's discontinuance of double portion meals and supplements, which was denied by the CPCRC on August 8, 2013. Dkt. #106-11, ¶ Q.

On June 6, 2013, plaintiff was seen by Dr. McMahon-Tronetti, the CCJ psychiatrist, who opined that plaintiff had intentionally dehydrated himself to get transferred to the hospital. Dkt. #106-11. She also noted that plaintiff was recorded on

surveillance vigorously exercising, suggesting that his subjective complaints of pain were manufactured or exaggerated.  Dkt. #105-16, p. 6.

On June 11, 2013, PA Hunt examined plaintiff at sick call, and noted that plaintiff's weight was stable at 158 lbs.  Dkt. #106-11, ¶ S; Dkt. #105-16, p. 8.  PA Hunt noted that plaintiff was observed exercising strenuously in an "attempt at w[eigh]t loss." Dkt. #105-16, p. 8.  Plaintiff refused sick call on June 18, 25, and July 1, 2013, so his weight was not recorded.  Dkt. #106-11, ¶ V.  He commenced this lawsuit in the interim on June 21, 2013.  Dkt. #1.

Plaintiff was seen again by PA Hunt on July 9, 2013, at which time his weight was noted to be 153.5 lbs.  Dkt. #106-11, ¶ W.   Plaintiff was seen again on July 23, and August 6, 2013 by PA Hunt, who started tracking plaintiff's Body Mass Index ("BMI") and ordered that plaintiff be weighed two times per week.  Dkt. #106-11, ¶ X. On August 6, 2013, plaintiff weighed 148 lbs.  Dkt. #105-16, p. 12.  Based on plaintiff's weight loss, PA Hunt ordered a blood count and metabolic profile and double portion meals.  Dkt. #105-16, p. 12; Dkt. # 106-11, p. 5.  The blood test results were normal and revealed no evidence of malnutrition.  Dkt. #106-11, ¶ X.  During the remainder of his detainment at CCJ (until March 2015), plaintiff was weighed weekly and administered his Humira injections as prescribed.  Dkt. #106-11, ¶ Y. Plaintiff's weight returned to its baseline of 167 lbs by October 2013.  Dkt. # 106-11, ¶ Y.  After August 6, 2013, Plaintiff never filed another Health Services Request relating to his Crohn's disease or weight

loss, but he was treated for some unrelated dental and skin issues by PA Hunt and other CCJ medical personnel.  Dkt. #106-11, ¶ Y.

## DISCUSSION AND ANALYSIS

**Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 798 (W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be

defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant*, 923 F.2d at 982 (internal citations omitted).  A party seeking to defeat a motion for summary judgment:

> must do more than make broad factual allegations and invoke the appropriate statute.  The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).


## 42 U.S.C. § 1983

Plaintiff brings his complaint under 42 U.S.C. § 1983, which provides a civil claim for damages against "[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.  "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."  *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (internal citations omitted).  To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must establish that a person acting under color of state law deprived him of a federal right.  *Id.*  Here, plaintiff claims that defendants violated his rights under the First, Eighth, and Fourteenth Amendments to the Constitution of the United States.  Dkt. #10.

**Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act ("PLRA") requires that a prisoner must exhaust all available administrative remedies before bringing an action under 42 U.S.C. § 1983 or any other federal law.  42 U.S.C. § 1997e(a).  "The PLRA exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong," *Porter v. Nussle,* 534 U.S. 516, 532 (2002), including the denial of medical care, *Turner v. Goord*, 376 F. Supp. 2d 321, 325 (W.D.N.Y. 2005).  It applies with equal force to pretrial detainees asserting deliberate indifference to serious medical need.  *Trybus v. Niagara County Jail Med. Staff Supervisor*, No. 13-CV-602A F, 2015 WL 1431681, at *3 (W.D.N.Y. Mar. 27, 2015).

As a practical matter, the administrative exhaustion requirement "reduce[s] the quantity and improve[s] the quality of prisoner suits," filters out frivolous claims, and clarifies the legal issues.  *Porter*, 534 U.S. at 524-25.  Thus, "[e]ven when the prisoner seeks relief not available in grievance proceedings" – such as monetary damages – "exhaustion is a prerequisite to suit."  *Id.* at 524 (citing *Booth v. Churner*, 532 U.S. 731, 741 (2001)).

To achieve "proper exhaustion" under the PLRA, *Woodford v. Ngo*, 548 U.S. 81, 93 (2006), prisoners must complete the administrative review process in accordance with the procedural rules set forth in the prison grievance process.  *Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012) (citing *Jones v. Bock*, 549 U.S. 199, 218

(2007)).  "[U]ntimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement."  *Ruggierio v. County of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) (quoting *Woodford*, 548 U.S. at 83-84).

New York provides a three-step administrative review process for an inmate housed at a county jail.  9 N.Y.C.R.R. § 7032.  At the initial step, an inmate with a complaint must file a grievance with the facility grievance coordinator, who must investigate and issue a written decision within 5 days.  9 NYCRR § 7032.4(f), (g) & (i).  If the inmate disputes the decision, he must file an appeal to the chief administrator of the facility, who as five days to decide the appeal.  9 NYCRR § 7032.4(j) & (k).  If the inmate is dissatisfied with that decision, he or she must make the third and final step of appealing to the CPCRC who must decide the issue within 45 days.
9 NYCRR § 7032.5.  An inmate does not exhaust his administrative remedies until he or she has completed each of these steps and received a letter that his final appeal has been denied.  *Gizewski v. New York State Dep't of Corrs. & Cmty. Supervision*, No. 9:14-CV-124, 2016 WL 3661434, at *13 (N.D.N.Y. July 5, 2016); *see Burgos v. Craig*, 307 Fed. App'x 469, 470 (2d Cir. 2008) (explicitly holding that "completing the exhaustion requirements only after filing suit is insufficient").

At the same time, a prisoner need not exhaust remedies if they are not "available."  *Ross v. Blake*, __ U.S. __, 136 S.Ct. 1850, 1855 (2016).  "[A]n administrative remedy may be unavailable when 'it operates as a simple dead end –

with officers unable or consistently unwilling to provide any relief to aggrieved inmates,'"
or "when prison administrators thwart inmates from taking advantage of a grievance
process through machination, misrepresentation, or intimidation."  *Williams v. Correction
Officer Priatno*, 829 F.3d 118, 124 2016 (2d Cir. July 12, 2016) (citing *Ross*, 136 S.Ct.
at 1859).  However, courts are no longer permitted to consider whether special
circumstances justify the prisoner's failure to comply with the administrative procedural
requirements.  *Ross*, 1136 S.Ct. at 1856; *see Williams*, 829 F.3d at 123 (recognizing
that framework set forth in *Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) and
*Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004), has been abrogated in part by
*Ross*).

        Defendants argue that plaintiff failed to exhaust his administrative
remedies in that he:  filed this lawsuit before his grievances related to his medical care
(Nos. 2013-116 & No. 2013-156) were ruled upon by CPCRC on July 23, 2013 and
August 13, 2013 (Dkt. #105-19, p. 55; Dkt. #106-1, p. 10); filed suit before his
grievances relating to the size of his meal portions (Nos. 2013 -129, 2013-130, 2013-
131 & 2013-132) were finally decided by the CPCRC on July 11, 2013 and July 23,
2013 (Dkt. #105-19, p. 76; Dkt. #106, pp. 7, 20, 35);[5] never filed any grievances against
Grupa, Wielgasz, Mitchell, and Garlick for allegedly ignoring his requests for medical
care, placing him in the "rubber room," or otherwise interfering with his medical
treatment; and never filed a grievance against any of the County Defendants for placing
him in SHU or administrative segregation.  Plaintiff alleges that the Chautauqua County

---

[5] Plaintiff's grievances alleging that he was being deprived access to the courts were also not
finally exhausted by the CPCRC until after the complaint was filed in this case.

Grievance Form does not indicate how long an inmate must wait for a decision before filing suit and that the Grievance Officer at the CCJ issued a form indicating that administrative housing decisions are not grievable.  Dkt. #118, ¶¶ 4, 6 & p. 61.  Plaintiff offers no explanation as to why he did not file grievances related to the County Defendants' ignoring his medical requests, placing him in a "rubber room," or interfering with his medical treatment at the WCA.

Based on the record, it appears that none of plaintiff's claims were properly exhausted before he filed suit.  As such, his claims are properly dismissed without prejudice on this basis alone.  However, as set forth in more detail below, after full discovery in the case, plaintiff has failed to offer any evidence in support of his claims that raises a genuine issue of material fact.  For this reason, defendants are entitled to summary judgment as a matter of law and plaintiff's claims may be dismissed on the merits.

**Eighth Amendment Claims**

"[W]hen the state takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999).  The Eighth Amendment, which applies to the states through the Due Process Clause of the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishments" on those convicted of crimes.  U.S. CONST. AMEND. VIII; *Wilson v. Seiter*, 501 U.S. 294, 297-98 (1991).  "Such punishment may include prison officials'

deliberate indifference to an inmate's serious medical needs." *Frank v. Cty. of Ontario*, 884 F. Supp. 2d 11, 17-18 (W.D.N.Y. 2012) (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)).

Although the Eighth Amendment does not directly apply to pretrial detainees, the due process protections afforded to pretrial detainees "are at least as great as the Eighth Amendment protections available to a convicted prisoner." *See City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 243-44 (1983) (citations omitted). The Second Circuit Court of Appeals has "often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment." *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000). As such, plaintiff's claims of deliberate indifference to his serious medical needs are properly analyzed under the Eighth Amendment deliberate indifference standard applicable to convicted prisoners. *Frank v. Cty. of Ontario*, 884 F. Supp. 2d 11, 17-18 (W.D.N.Y. 2012).

<u>Medical Needs</u>

To prove that a defendant's actions or omissions amounted to "deliberate indifference to a serious medical need" in violation of the Eighth Amendment, *Estelle*, 429 U.S. at 106, a plaintiff prisoner must prove: (1) the existence of a serious medical need; and (2) the defendant's deliberate indifference to that need. *Frank*, 884 F. Supp. 2d at 18. "Deliberate indifference" has both objective and subjective components. *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991). Objectively, a medical condition is

"sufficiently serious" if it constitutes a condition of urgency that may result in death, degeneration, or extreme pain. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Subjectively, plaintiff must show that the defendant acted with a culpable state of mind and intended wantonly to inflict pain. *Wilson*, 501 U.S. at 299; *DesRosiers v. Moran*, 949 F.2d 15, 19 (1st Cir.1991*); Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir.), *cert. denied*, 506 U.S. 1040 (1992). Deliberate indifference exists when a defendant "knows of and disregards an excessive risk to inmate safety," that is, the defendant "must be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

"A [prisoner's] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eight Amendment." *Estelle,* 429 U.S. at 106. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id*. Rather, to prevail on a deliberate indifference claim, the plaintiff must allege conduct that is "repugnant to the conscience of mankind," 429 U.S. at 102, or "incompatible with the evolving standards of decency that mark the progress of a maturing society." *Id*. at 105-06. Put another way, plaintiff must demonstrate that the defendant "actually wished him harm, or, at least, was totally unconcerned about his welfare." *Veloz v. New York*, 339 F. Supp. 2d 505, 521 (S.D.N.Y. 2004).

Likewise, an inmate's "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). "Indeed, prison officials and medical officers have wide discretion in treating prisoners, and Section 1983 is not designed to permit federal courts to interfere in the ordinary medical practices of state prisons." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citing *Church v. Hegstrom*, 416 F.2d 449, 450-51 (2d Cir.1969)).  Further, decisions made by prison medical staff regarding medical treatment are entitled to a "presumption of correctness."  *Perez v. County of Westchester*, 83 F. Supp. 2d 435, 440 (S.D.N.Y. 2000) (citing *Kulak v. City of New York*, 88 F.3d 63, 77 (2d Cir.1996)).

In this case, plaintiff cannot meet the objective or subjective elements of his deliberate medical indifference claim.  Plaintiff entered CCJ with Crohn's disease, which although chronic, was not a condition of "urgency" which could produce "death, degeneration, or extreme pain," *Hathaway*, 37 F.3d at 66, in the absence of a legitimate "flare" of the disease.  *See e.g., Veloz*, 339 F.Supp.2d at 521-22 (holding that the plaintiff's chronic degenerative spondylosis, although painful, was not a sufficiently serious medical need).  Moreover, there is no objective evidence that plaintiff experienced a "flare" of his Crohn's disease during his incarceration at the CCJ. Although plaintiff was taken to the WCA Emergency Department, plaintiff was diagnosed with dehydration, likely a result of his unilateral decision "to go without eating

or drinking for as long as it took to recover"  Dkt. #118, ¶ 68; Plaintiff's CT scans was

negative for a Crohn's flare, and his bloodwork revealed slight dehydration only.  Dkt.

#106-11, ¶ O; *Avallone v. Hofman*, No. 2:06-CV-253, 2009 WL 2957955, at *5 (D. Vt.

Sept. 9, 2009) (holding that the plaintiff's symptoms of seizure, vomiting, diarrhea and

dehydration for a period of two days did not provide a basis for an Eighth Amendment

claim).  Lastly, plaintiff did not meet the criteria for admission at WCA; and after being

given fluids, he was discharged back to the CCJ, further undermining his medical

claims.  Dkt. #106-11, ¶ O.


          With respect to plaintiff's subjective complaints of pain and nausea, these

also do not rise to the level of an Eighth Amendment violation.  *Ross v. McGinnis*, No.

00-CV-275E(Sr), 2004 WL 1125177, at *10 (W.D.N.Y. Mar. 29, 2004) (holding that

plaintiff's complaints of abdominal pain, vomiting, heartburn, constipation, and extreme

body heat do not constitute a serious medical need).  Even if they did, the record shows

that PA Hunt and NP Thayer were reasonably responsive to plaintiff's numerous

medical complaints, seeing him in sick call numerous times and ordering medications to

treat his purported symptoms.  The medical records show that after an initial screening

by CCJ nursing staff, PA Hunt examined plaintiff, noted his history of Crohn's disease,

had plaintiff sign HIPPAA forms to confirm his diagnosis and past treatment,

immediately began a protocol of medications, and ordered an evening snack to help

manage plaintiff's disease.  Dkt. #106-11, ¶ D.  PA Hunt increased plaintiff's prednisone

when he complained of stomach pain.  Dkt. #106-11, p. 2.  Once plaintiff's prior use of

Humira was verified on May 7, 2013, PA Hunt immediately issued an order that plaintiff

be given a Humira shot every two weeks, consistent with a standard dosing schedule, and the first shot was administered the following week.  Dkt. #106-11, ¶¶ J, L.

After plaintiff stopped eating, drinking, and taking his medicine and began to complain of vomiting, PA Hunt prescribed Zofran, an anti-nausea medication, to treat his symptoms.  Dkt. #106-11, ¶¶ N, O.  PA Hunt later examined plaintiff in his cell, and ordered that he be taken to the hospital.  Dkt. #106-11, ¶ O.

PA Hunt did not prescribe opioids to treat plaintiff's stomach pain, but another analgesic, which plaintiff alleges did not control his pain.  Dkt. #106-6, ¶ 11, 15. However, plaintiff's opinion that PA Hunt should have prescribed a stronger pain medication, standing alone, does not create a genuine issue of fact as to whether the Medical Defendants were deliberately indifferent.  *See Evans v. Manos*, 336 F. Supp. 2d 255, 262-63 (W.D.N.Y. 2004) (holding that the prisoner's testimony that Advil was "inadequate to relieve his pain" was not enough to survive prison doctor's motion for summary judgment); *Veloz*, 339 F. Supp. 2d at 525 (holding that inmate's opinion that he needed something stronger than Tylenol for back pain does not implicate the Eighth Amendment).

Plaintiff's layman opinion that the medications prescribed to him upon his admission to CCJ were not "proper" also does not create a genuine issue of fact. Under the circumstances, this Court finds that it was reasonable for PA Hunt to hold off on prescribing Humira, a powerful drug with serious potential side effects, until plaintiff's

history of Crohn's disease and prior treatment could be confirmed by his medical

records.  Defendant Hunt's medical expert, Louis v. Antignano, M.D., a

gastroenterologist, opined that Imodium, prednisone, and the other medications initially

prescribed by PA Hunt were appropriate for a patient with Crohn's disease.  Dkt. #106-

7, ¶¶ 16-17; Dkt. #106-8, pp. 2-3.  Even if plaintiff could support his claim that initially

prescribed medications were inappropriate, "[t]he Eighth Amendment is not implicated

by prisoners' complaints over the adequacy of the care they received when those claims

amount to a disagreement over the appropriateness of a particular prescription plan."

*Veloz*, 339 F. Supp. 2d at 525.


Plaintiff's complaint that his meals were inadequate also does not

implicate the Eighth Amendment because he has cited to no evidence that his weight

loss was "sufficiently serious" or that PA Hunt or NP Thayer were unconcerned about

his welfare.  According to the records, plaintiff's bloodwork, taken about two and a half

months into his stay at CCJ, did not indicate that plaintiff was malnourished.  Dkt. #106-

11, ¶ X.  To the extent that plaintiff cooperated with weigh-ins, his weight, even at its

lowest of 148 lbs, always fell within the limits of a normal BMI.  Dkt. #106-6, ¶¶ 44-45.

This was true despite plaintiff's vigorous exercise and intermittent abstention from food,

drink, and medication, which further undercut his claims of serious medical need.  *See,*

*e.g., Frank*, 884 F. Supp. 2d at 20 ("Even when the facts are construed in [the plaintiff

prisoner's] favor, then, the Court finds that plaintiff has not presented sufficient evidence

for a factfinder to conclude that any delays with respect to the treatment that he

received at the Jail posed a serious risk to his health, particularly in light of plaintiff's

repeated failures to cooperate with his physicians, both in and out of the Jail").

Contrary to plaintiff's claims, PA Hunt took reasonable measures to insure

that plaintiff's dietary needs were being met, including:  ordering that plaintiff be

provided an evening snack (Dkt. #106-11, ¶ D); conferring with the Food Supervisor

Eggleston to determine how many calories plaintiff was getting on a daily basis

(Dkt. #106-11, ¶ K); ordering weekly, then bi-weekly, weigh-ins to objectively verify

plaintiff's alleged weight loss (Dkt. #106-11, ¶¶ M, V-X); tracking plaintiff's BMI (Dkt.

#106-11, ¶ W); ordering blood tests to look for any signs of malnutrition (Dkt. #106-11,

¶ X); and ultimately directing that plaintiff be provided with double meals when his

weight went below 150 lbs (Dkt. #106-6, ¶ 45).  It cannot be said that this care rendered

by PA Hunt was "incompatible with the evolving standards of decency that mark the

progress of a maturing society."  *Estelle*, 429 U.S. at 105-6.

Regarding NP Thayer, the record shows that she initially refused to order

double portion meals for plaintiff because the Crohn's Disease treatment guidelines

from the Mayo Clinic recommended small, frequent meals.  Dkt. #106-11, ¶ I.

Dr. Antignano, PA Hunt's expert gastroenterologist, opined that double portion meals

were not appropriate for plaintiff given his prior surgery:

> Given [that] Mr. Coggins' Crohn's affected his colon, double portion meals
> would have been of no benefit, as the colon does not play a major role in
> nutrient absorption.  Indeed, [for] a person like Mr. Coggins[,] who is
> missing a substantial portion of the his colon, including the ileocecal valve,
> large meals would most likely simply result in large, urgent bowel
> movements an hour or two after eating.  In reviewing Mr. Coggins's

> records from Great Meadow from January 2013 to his release in March
> 2013, it appears the physicians there did not feel any additional calories
> were indicated, as there is a notation [that] Ensure (a supplement drink)
> was "not indicated."

Dkt. #106-7, ¶ 20.  The fact that NP Thayer discontinued the double portion meals

ordered by the WCA doctor upon plaintiff's discharge also does not bring his claim

within the purview of the Eighth Amendment.  *See Wright v. Genovese*, 694 F. Supp.2d

137, 160 (N.D.N.Y. 2010) (holding that the fact that the defendant prison doctor

disagreed with an outside cardiologist regarding the plaintiff prisoner's treatment does

not support a deliberate indifference claim).


Regarding plaintiff's unexhausted complaints that corrections officers on

his floor ignored his medical complaints, plaintiff has offered no evidence that the

officers restricted his access to medical treatment.  To the contrary, plaintiff completed

at least nine Health Services Request forms between May 12, and May 26, 2013 (Dkt.

#105-15, pp. 21-29), and was seen by CCJ medical staff on at least three occasions

between May 14, and May 27, 2013.  Dkt. #106-6, ¶¶ 28-29.  This clearly shows that the

officers were relaying plaintiff's requests for treatment to the medical staff.  *See*

*Davidson v. Desai*, 817 F. Supp. 2d 166, 190-91 (W.D.N.Y. 2011) (granting summary

judgment in favor of defendants on prisoner plaintiff's deliberate indifference claim

where "[p]laintiff was seen in sick call multiple times each month" and no evidence was

presented showing that any request for a sick call was ever denied).

Plaintiff's claim that officers exhibited deliberate indifference to his medical needs by transferring him to a padded cell is not supported by evidence that the officers were acting with the intent to harm him.  Plaintiff himself admitted that he had fallen down several times and at one point, banged his head on the wall.  Dkt. #1, ¶¶ 67-68. Plaintiff had been seen in his cell by a nurse who gave him anti-nausea medication, but he continued to experience dizziness (as it was later determined, due to dehydration). Dkt. #1, ¶¶ 67-68.  According to the incident report, plaintiff was moved to a padded cell for closer observation and was returned to his cell a few hours later.  Dkt. #105-18, p. 9. Absent any evidence that the officers moved plaintiff for some nefarious purpose, his temporary transfer to a padded cell does not support a claim of deliberate indifference under the Eighth Amendment. *Harvey v. Harder*, No. 9:09-CV-154 TJM/ATB, 2012 WL 4093792, at *9 (N.D.N.Y. July 31, 2012), *report and recommendation adopted*, No. 9:09-CV-154, 2012 WL 4093760 (N.D.N.Y. Sept. 17, 2012) (dismissing plaintiff prisoner's claim asserting deliberate indifference to his medical needs against officers who transferred him to a separate unit for observation).

Finally, the WCA medical records do not support plaintiff's claim that he would have been admitted for treatment of his Crohn's disease if Officer Seeley had not intervened. *See Bowman v. Campbell*, 850 F. Supp. 144, 147 (N.D.N.Y. 1994) (dismissing a deliberate indifference claim against a prison nurse where the prisoner plaintiff "presented no evidence that [the nurse] interfered with or intentionally delayed the treatment prescribed by doctors").  The medical evidence shows that plaintiff was dehydrated and after being treated with IV fluids, did not need to be admitted.  It is

undisputed that plaintiff's CT scan was negative for a Crohn's flare, and that he was discharged after getting fluids.

*Mental Health Needs*

Plaintiff also makes vague allegations that unnamed parties were deliberately indifferent to his mental health needs, but has offered no evidence in support of his claims.  The medical records show that he was seen multiple times by mental health staffers at CCJ, who prescribed medications for plaintiff and thereafter monitored his dosage.  Dkt. #105-15, p. 27; Dkt. #1, ¶¶ 121-22.  Plaintiff's disagreement with his treatment plan cannot form a basis for an Eighth Amendment deliberate indifference claim where the record shows he was being treated.  *See Flemming v. Wurzberger*, 490 F. Supp. 2d 320, 323-24 (W.D.N.Y. 2007) (holding that prisoner plaintiff could not sustain a claim for deliberate indifference based on his medications being discontinued where the record shows that the facility provided him with adequate treatment, specifically, monthly therapy meetings with a social worker and psychiatric evaluations via video conferencing); *see also Mills v. Luplow*, No. 04-CV-5(A)(M), 2009 WL 2579195, at *10 (W.D.N.Y. Mar. 30, 2009) (holding that the plaintiff had no claim for deliberate indifference against prison health service providers where he was seen by mental health staff each time he requested and he continuously received medications).

*Inadequate Meals*

Plaintiff alleges that defendant Eggleston overstated the amount of calories plaintiff was getting in his meals and that the prison meals were inadequate for a person with Crohn's disease.  However, the record is clear that Eggleston, as the

Food Supervisor, oversaw the preparation of meals at CCJ, but did not create the menu. Rather, the menus and entrees were created by the New York State Department of Corrections Food Production Center (Dkt. #15-5, ¶¶5-6), "reviewed and approved by a registered dietitian for nutritional and caloric value" (Dkt. #105-19, p. 66), and prepared at CCJ using "precise measuring utensils" to ensure proper portions (Dkt. #115-5, ¶ 7). Absent special circumstances, all inmates at the CCJ are served standard meals and portion sizes. Dkt. #115-5, ¶ 8. If an inmate has a special medical condition that requires meals or portions that are different than the standard meals, the medical staff must prescribe a special diet. Dkt. #115-5, ¶ 9. Without such approval, Eggleston did not have the authority to serve non-standard meals to an inmate. Dkt. #115-5, ¶ 10

As previously noted herein, plaintiff was not prescribed a special diet except for an evening snack, which he was provided by the kitchen staff. Under the circumstances, it cannot be said that defendant Eggleston intentionally withheld meals which were deemed by medical personnel to be necessary. "Mere negligence or inadvertent failure to provide a medically necessary diet is not a constitutional violation, however." *Abdush-Shahid v. Coughlin*, 933 F. Supp. 168, 180 (N.D.N.Y. 1996). More importantly, non-medical defendants, like Mr. Eggleston, are "entitled to rely on the judgment of the medical staff" regarding the propriety of an inmate's meals. *Id.*, 933 F. Supp. at 184.

For the following reasons, all of the defendants are entitled to summary judgment on plaintiff's deliberate indifference claims.

**Due Process Claims**

"To prove a violation of due process, a plaintiff must establish that:  (1) he possessed a liberty interest; and (2) defendants deprived him of that interest without sufficient process."  *Walker v. Fisher,* 523 Fed. Appx. 43, 44 (2d Cir. 2013) (citing *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir. 2001)); *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir. 2004).  An inmate's protected liberty interest is implicated only where the conduct at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner,* 515 U.S. 472, 484 (1995).

"Although the courts have refrained from adopting a 'bright line' rule that a certain period of segregated confinement automatically fails to implicate due process rights . . . decisions in the Second Circuit have routinely found that the disciplinary sanction [of] thirty days keeplock confinement and loss of privileges does not constitute 'atypical or significant hardship' under *Sandin.*"  *Davidson v. Murray*, 371 F. Supp. 2d 361, 368-69 (W.D.N.Y. 2005) (citing cases).  Plaintiff alleges that he was confined to SHU without a hearing on May 28, 2013 (Dkt. #1, ¶ 83), and he argues, without citing to any evidence, that he was "in said segregation for the majority of his time at the CCJ." Dkt. #118, ¶ 13.  This claim is belied by the record.  An incident report indicates that plaintiff was fighting with another detainee in the CCJ recreation yard less than a month later, on June 27, 2013.  Dkt. # 105-18, p. 12.  This "exceedingly short" period of time spent in disciplinary segregation is insufficient to establish a protected liberty interest.

*Davidson*, 371 F. Supp. 2d at 369.  In the absence of such an interest, this Court need

not reach the issue of whether the "protective procedures afforded to plaintiff" passed

"constitutional muster."  *Faison v. Hash*, No. 03-CV-6475P, 2004 WL 944523, at *5

(W.D.N.Y. Apr. 23, 2004).  As such, the County Defendants are entitled to summary

judgment on plaintiff's due process claim.


**Retaliation Claim**

            To establish a First Amendment retaliation claim, an inmate must

show that:  (1) he was engaged in constitutionally protected activity; (2) the defendants

took adverse action against the plaintiff; and (3) there was a causal connection between

the protected activity and the adverse action in that the alleged conduct was

substantially motivated by the protected activity.  *Gill v. Pidlypchak,* 389 F.3d 379, 380

(2d Cir. 2004).  The plaintiff bears the initial burden to show that the defendant's actions

were improperly motivated.  "Adverse action" is retaliatory conduct "that would deter a

similarly situated individual of ordinary firmness" from exercising his constitutional rights.

*Barrington v. New York*, 806 F. Supp. 2d 730, 745 (S.D.N.Y. 2011) (internal citations

omitted).  If it would not, the retaliatory act is *"de minimis* and therefore outside the

ambit of constitutional protection."  *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir. 2001).

*overruled on other grounds by Swierkiewicz v. Sorema*, 534 U.S. 506 (2002).


            Because claims of retaliation can be invoked with "relative ease," *Cannon*

*v. Wood*, No. 9:10-CV-01332 (GTS/RFT), 2013 WL 838299, at *4-6 (N.D.N.Y. Jan. 22,

2013), *report and recommendation adopted,* No. 9:10-CV-1332 (GTS/RFT), 2013 WL

838294, at *3 (N.D.N.Y. Mar. 6, 2013), courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d at 872 (citation omitted); *Dawes,* 239 F.3d at 491 (stating that "virtually any adverse action taken against a prisoner by a prison official - even those otherwise not rising to the level of a constitutional violation - can be characterized as a constitutionally proscribed retaliatory act"); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir. 1996).

Plaintiff has alleged that the County Defendants abused, harassed, and tormented him, falsified documents, refused him medical treatment, and enticed and recruited inmates to assault him.  Dkt. #118, ¶ 17.  Not only has plaintiff made these allegations in conclusory terms, he also has cited no evidence that the defendants engaged in this offensive conduct or that they were engaged in the conduct to stop plaintiff from filing grievances.  This is insufficient as a matter of law to survive a dispositive motion.  *See Crenshaw v. Hartman*, 681 F. Supp. 2d 412, 416 (W.D.N.Y. 2010) (holding that "[a] plaintiff cannot state a retaliation claim in wholly conclusory terms, but rather, must provide a pleading that is 'supported by specific and detailed factual allegations'") (internal citations omitted); *see also Sawyer v. Jowers,* No. 2:08-CV-0186, 2008 WL 4791557, at *6 (N.D.Tex. Oct. 31, 2008) (stating that "[t]o state a claim of retaliation, the inmate must allege more than his personal belief that he is the victim of retaliation; [c]onclusory allegations of retaliation are not sufficient; the plaintiff must [allege facts] from which retaliation may plausibly be inferred").  Accordingly, the County defendants are entitled to summary judgment on this claim.

**Access to Courts**

Plaintiff asserts that he was denied access to the courts because the jail did not provide him with sufficient legal material to commence an Article 78 proceeding. Dkt. #1, ¶¶ 125-28. This claim fails because plaintiff has not demonstrated "actual injury" resulting from this alleged denial of access. *See Ramsey v. Goord*, 661 F. Supp. 2d 370, 401 (W.D.N.Y. 2009) (holding that "[n]o cause of action for interfering with an inmate's First Amendment right of access to the court lies . . . until and unless the inmate demonstrates that he suffered actual harm, i.e., that a nonfrivolous legal claim had been frustrated or impeded").

Plaintiff admitted that there was nothing in his Article 78 petition that was not raised in his Complaint in this case. Dkt. #115-2, ¶ 21. Plaintiff commenced this case on June 21, 2013, within 20 days of the last incident alleged therein, June 4, 2013. Dkt. #1, ¶ 90. Thus, at most, there was a three-week delay in plaintiff filing his claims, all of which have been vetted by this Court. In this regard, there has been no injury to plaintiff based on any alleged interference with his access to courts. *See Warburton v. Underwood*, 2 F. Supp. 2d 306, 312 (W.D.N.Y. 1998) (holding that plaintiff's access to the courts claim must be dismissed where plaintiff "offer[ed] no facts to explain how a fourteen day delay in service prejudiced [his] ability to seek redress from the judicial system"). For this reason, defendants are entitled to summary judgment on this claim.

**Personal Involvement**

Defendants must be personally involved in an alleged constitutional deprivation for a plaintiff to be awarded damages under 42 U.S.C. § 1983. *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)*; Colon*, 58 F.3d at 873; *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir. 1989). Plaintiff argues that defendants Crowell, Mitchell, and Gerace are liable "under Superior's/Supervisor's liability." Dkt. #118, ¶ 15. However, "[t]here is no *respondeat superior* liability in § 1983 cases." *Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995). Put another way, supervisory officials may not be held liable merely because they held a position of authority, *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996), or failed to respond to a prisoner's letter, *Parra v. Wright*, No. 11-CV-6270FE, 2011 WL 3608475, at *2 (W.D.N.Y. Aug. 10, 2011). As plaintiff has failed to allege any personal involvement on the part of defendants Crowell, Mitchell, and Gerace, these defendants are entitled to summary judgment on this basis as well.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court recommends that the defendants' motions for summary judgment (Dkt. Nos. 105, 111 & 115) be GRANTED.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation, and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b)(2) and Local Rule 72.  **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72 of the Local Rules for the Western District of New York, "written objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection, and shall be supported by legal authority."  **Failure to comply with the provisions of Local Rule 72 may result in the District Judge's refusal to consider the objection.**

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).  In accordance with the requirements set forth in Local Rule 72, "[a]ny party filing objections to a Magistrate Judge's order or recommended disposition must include with the objections to the

District Judge a written statement either certifying that the objections do not raise new

legal/factual arguments, or identifying the new arguments and explaining why they were

not raised to the Magistrate Judge."

**SO ORDERED.**

DATED:        Buffalo, New York
                     March 21, 2017

                                                    _s/ H. Kenneth Schroeder, Jr._
                                                    **H. KENNETH SCHROEDER, JR.**
                                                    **United States Magistrate Judge**